IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFF HANLON, individually and on behalf of all others similarly situated, | ) ) ) |
| | Civil Action No. 2:11-cv-00987-GLL |
| Plaintiff, | ) ) |
| | Electronically Filed |
| v. | ) ) |
| PALACE ENTERTAINMENT HOLDINGS, LLC, FESTIVAL FUN PARKS, LLC and DOES 1 through 10, inclusive, | ) ) ) ) ) |
| | Chief Judge Gary L. Lancaster |
| Defendants. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND PAYMENT OF PLAINTIFF INCENTIVE AWARD**

**I.     PRELIMINARY STATEMENT**

Plaintiff, Jeff Hanlon ("Plaintiff"), by his counsel, hereby moves for an award of attorneys' fees, costs and a Plaintiff's incentive payment. The fee and cost request is reasonable and appropriate. Specifically, the amount of fees and costs to be paid to Class Counsel was negotiated separate and apart from the relief negotiated on behalf of the Class, and the payment of fees and costs by Defendant in no way diminishes the amount of relief to be paid to the Class. This fact entitles the Parties' fee and costs agreement to substantial deference. Further, the amount of fees and costs negotiated by the Parties is reasonable and appropriate under a lodestar analysis. The incentive payment requested for Plaintiff is also reasonable and appropriate under well-established authority.

**II.     BACKGROUND OF THE LITIGATION**

Class Representative Jeff Hanlon filed the instant action on August 1, 2011. On behalf of himself and other putative Class Members, Plaintiff alleges that Defendants Palace

Entertainment Holdings, LLC and Festival Fun Parks, LLC violated the Fair and Accurate Credit Transactions Act, 15 U.S.C. § 1681, *et seq.* ("FACTA"). Specifically, Plaintiff alleges that Defendants violated 15 U.S.C. § 1681(g)(1) which provides:

> [N]o person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale of the transaction.

On August 23, 2011, Plaintiff filed his First Amended Complaint. Defendants filed an Answer thereto on October 7, 2011.

On October 4, 2011, the Parties filed a Stipulation Selecting ADR process, pursuant to which they agreed to mediate the claims in dispute before United States District Judge Mark R. Hornak. An all-day mediation before Judge Hornak was conducted on October 26, 2011, at which point, the case was resolved, subject to the negotiation of minor terms. The Parties executed a Class Action Settlement Agreement ("Settlement Agreement") on or about December 9, 2011.[1]

Pursuant to this Agreement, the Parties have agreed to certification, for settlement purposes only, of the following Class:

> All persons who received electronically printed receipts at any Participating Palace Park at the point of sale or transaction in a transaction occurring between December 4, 2006 and the Preliminary Approval Date wherein the receipt displayed: (1) more than the last five digits of the person's credit card or debit card number, and/or (2) the expiration date of the person's credit card or debit card number. Expressly excluded from the class is any individual whose identity was stolen as a result of the conduct being challenged in the underlying lawsuit.

### III.   THE TERMS OF THE SETTLEMENT

Defendants acknowledge that between June 4, 2008 and August 2011 fifteen of their forty amusement parks were using Point of Sale Equipment that was not programmed to truncate

---

[1] A copy of the Settlement Agreement is appended to the Joint Motion for Preliminary Approval as Exhibit 1.

the entire expiration date from printed credit or credit card receipts given to their customers.[2]  As a result, approximately 1,844,066 receipts were presented to customers wherein the expiration date of their credit or debit card was not fully truncated.  Defendants' investigation has shown that no Palace customers were ever presented with receipts that displayed more than the last five digits of their card number during the Settlement Class Period.  Defendants vehemently maintain that they did not willfully violate FACTA's truncation requirements and that, on the contrary, they took specific steps calculated to fully comply with FACTA.

The Parties agree that neither Plaintiff, nor any putative Class Member, has suffered any actual monetary injury as a result of the FACTA claims at issue.

Against this backdrop, and in the interest of avoiding protracted and costly litigation, Defendants have agreed to a proposed settlement with the following basic terms:

Defendants agreed to enter into a Consent Decree, pursuant to which they will remain in full compliance with the truncation requirements of FACTA.

Defendants have agreed to provide every Participating Class Member with one free admission ticket to the Participating Palace Park at which the Class Member was presented with an electronically printed receipt that displayed all or a portion of the expiration date of the Class Member's credit or debit card for any date on which the Participating Palace Park is open between June 1, 2012 and June 28, 2012 and September 4, 2012 and September 30, 2012 ("Free

---

[2]  The Class is defined to include certain persons who received an electronically-printed receipt at a Participating Palace Park between December 4, 2006 and the Preliminary Approval Date. Defendants' investigation has shown that no Palace customers were ever presented with receipts that displayed more than the last five digits of their card number during the Settlement Class Period.  The only claims that are at issue in this case, accordingly, are claims involving receipts containing expiration dates.  In accordance with the Credit and Debit Card Receipt Clarification Act of 2007, 15 U.S.C. §1681n(d), Defendants cannot be held liable under FACTA for any customer receipts bearing an expiration date that were printed prior to June 4, 2008.  Accordingly, Defendants limited their analysis to receipts that were printed at their parks between June 4, 2008 and August 2011—when their Point of Sale Equipment was brought into compliance with FACTA.

3

Admission Tickets"). The Settlement Agreement further stipulates that, in the event that fewer than 60,000 Settlement Class Members submit claims, Defendants will provide Free Admission Tickets to their customers and selected children's charities until a total of 60,000 Free Admission Tickets have been distributed.

Of the approximately 57,634 Free Admission Tickets (out of 60,000) that were not claimed by Class Members, Defendants intend to distribute approximately 10,000 Free Admission Tickets to children's charities, such as Make a Wish, Big Brothers, the American Heart Association's Jump Ropes and Hoops for Heart programs, and the children's outreach program of United Cerebral Palsy. Defendants intend to distribute the remaining approximately 47,634 Free Admission Tickets to customers through social media.

Defendants have agreed to pay the cost of Notice and claims administration.

Defendants have agreed to pay Class Counsels' attorneys' fees and allowable Litigation costs and expenses in the amount of $225,000.00.

Finally, Defendants have agreed to pay Plaintiff an incentive payment in the amount of $2,500.00.

## IV. LEGAL ANALYSIS

### A. The Fee and Costs Agreement Reached By Counsel For The Parties Was Negotiated Independently From, And In Addition To, Class Relief And Is Thus Entitled To Significant Deference.

The Parties negotiated fees and costs separately from Class relief – after agreement regarding Class relief was reached. Because the fee negotiation was premised upon the condition that the fee would be in addition to, and separate from any amounts that would be applied to fund the Class relief, the fee agreement reached by the Parties is entitled to substantial deference. Another Judge on this Court discussed this issue as follows:

> Moreover, the parties' negotiations were based upon a knowledgeable analysis of what an appropriate fee would be for the benefits achieved and the fees awarded in similar situations. Plaintiffs' counsel negotiated with their adversaries, who saw the effort made by plaintiffs' counsel first hand, knew plaintiffs' counsels' lodestar in the case and were well aware of how much time was reasonably required to prosecute this case. Weiss/Specter Decl. at ¶ 162. Counsel for Metlife had an interest in protecting Metlife's treasury and Metlife had a direct financial interest in the amount of the fee. Counsel for Metlife are lawyers who have litigated from the defense side for many years and know the applicable law pertaining to fee awards, including *Prudential II*, and were able to consider and utilize as precedent fee decisions from other action of a similar nature. In such circumstances, the end result of those negotiations – which reflects both sides' experience as to what is appropriate – is entitled to a great deal of weight in ruling on the fee request.
>
> In *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), for example, the Supreme Court held that negotiated, agreed-upon attorneys' fee arrangements, such as the one here, are the 'ideal' toward which the parties should strive: 'a request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.' *See also, Matter of Continental Ill. Sec. Litigat.*, 962 F.2d 566, 568-70 (7th Cir. 1992) (market factors, best known by the negotiating parties themselves, should determine the quantum of attorneys' fee).
>
> \*   \*   \*   \*
>
> The Court's role in the present context is substantially different from that in the traditional 'common fund' case, in which the awarded fee is subtracted from the total amount of money and/or benefits made available to the class, thereby diminishing those benefits. Here, plaintiffs' counsel's fee will not affect the Class recovery. This case is also very different from a 'statutory fee shifting' case, in

> which the defendant has not agreed to pay plaintiffs' counsels' fees and thus reserves the right to challenge every item of work performed that underlies the requested fee. Here, Metlife has agreed to pay the amount of fees sought by plaintiffs' counsel. Because Metlife has agreed to pay plaintiffs' counsels' fees and to reimburse counsels' expenses (up to $2.5 million) wholly apart from any award to the Class, and because the nature of the negotiations demonstrates that this fee was not 'traded off' for a lesser result for the Class, the Court need not 'award' the fee as if it were being paid out of the Class recovery or being challenged item by item by the defendant. Rather, the Court need only approve the overall settlement package – including its fee and expense provisions – as fair, reasonable, and adequate. *See, e.g., Officers for Justice v. Civil Services Com'n. of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982); *In re M.D.C. Holdings Sec. Litig.*, 1990 U.S. Dist. Lexis 15488, at *12-13 (S.D.Ca. Aug. 30, 1990). (*See* Compendium of Unreported Authority – Fees at Exhibit 1.)
>
> Particularly because the fees were negotiated after the Settlement was negotiated, there is no reason for this Court to second-guess whether Metlife, a sophisticated insurance company with experienced and competent counsel not needing the Court's protection, may have underpaid or overpaid in negotiating its exposure to fees and expenses. The only consequence of such second-guessing would be a windfall to Metlife and no further benefit to the Class. Moreover, such second-guessing is completely unwarranted in this case where, as shown below, the requested fee is not excessive in comparison to other similar cases…and the uncontested Affidavits of plaintiffs' counsel showing the amount of time, effort and expenses justify the amount of agreed to fees and expenses.

*In re: Metropolitan Life Insurance Company Sales Practices Litigation*, No. 96-179-MC (W.D. Pa., December 28, 1999)(Ambrose, J.)("*MetLife*"). Consistent with the analysis in *MetLife*, Plaintiff respectfully requests that the Court endorse the agreement regarding counsel fees and costs that was negotiated by experienced counsel, and mediated by the Court.

### B.  Western District Common Fund Authority

If the proposed Settlement is analyzed under a traditional "common fund" analysis, there is substantial authority from the Western District which supports the propriety of the amount of fees and costs negotiated by the Parties in this case. As noted in the Motion accompanying this Memorandum, the requested fees and costs in the amount of $225,000.00

represents a percentage of the guaranteed value of the settlement of 11.95%.[3]  This is well below the fee percentage historically approved in class actions by courts sitting in the Western District.  Some examples follow:[4]

| **Case Name** | **Fee As Percent of Recovery** |
|---|---|
| *In re:  Westinghouse Securities Litigation,* C.A. Nos. 91-354, 97-309, 97-960 | 33.3% |
| *DiCicco v. American Eagle Outfitters, Inc.,* C.A. No. 95-1937 | 33.3% |
| *In re:  Crown American Realty Trust Securities Litigation*, C.A. 95-202J | 33.3% |
| *In re:  USX Corporation, Steel Stock Securities Litigation,* C.A. 93-1246 | 30% |
| *In re:  Sulcus Computer Corporation Securities Litigation*, C.A. 92-1165 ("*Sulcus I*") | 33% |
| *In re:  Sulcus Computer Corporation Securities Litigation,* C.A. 94-0565 ("*Sulcus II*") | 30% |
| *In re:  PNC Securities Litigation*, C.A. 90-592 | 33% |
| *Schmitzer v. The Italian Oven, Inc. et al.*, 96-1248 | 30% |
| *In re:  Blue Cross of Western Pennsylvania Litigation*, 93-1591 | 30% |

---

[3] *See* Fee Motion at ¶ 7.

[4] Excluded from this sampling are "mega-fund" cases like *MetLife, supra.*, which are arguably governed by a different fee analysis.  *See, In re Chambers Development Securities Litigation*, 912 F.Supp. 852 (W.D. Pa. 1995)("In the normal range of common fund recoveries in securities and antitrust suits, common fund fee awards fall in the 20 to 30 percent range.  This fee percentage would often be higher on a proportional basis for modest recoveries because of the larger ratio of hours to recovery amount that would likely be involved.  On the other hand, the fee percentage would be significantly more modest as the common fund recovery begins to reach recoveries approaching or exceeding $100 million, based on the notion that the effort necessary to achieve recovery dollars at the high end was less onerous, on a sliding scale, than the effort expended for recovering the threshold sums by the judgment or settlement.") *citing Newberg on Class Actions*, § 14.03, at 14-13-14-14.

If the negotiated fee and expense amount is evaluated as a percentage of the recovery made available to the Class, it falls significantly below the range of fees historically approved by courts sitting in this district.

Common fund jurisprudence within the Third Circuit teaches that seven factors should be considered by a district court that is applying a percentage of recovery analysis to confirm the propriety of a given fee award:  (1)  the amount of the value created and the number of persons benefited;  (2)  the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;  (3)  the skill and efficiency of the attorneys involved;  (4)  the complexity and duration of the litigation;  (5)  the risk of nonpayment;  (6)  the amount of time devoted to the case by plaintiff's counsel; and, (7)  awards in similar cases.  *In re Cendent Corp. PRIDES Litig.*, 243 F.3d 722, 735, citing *Gunter v. Ridgewood Energy Corporation*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).

The amount of value created and the number of persons benefited supports the fee request.  Those Class Members who care to participate in the settlement and return claims forms will receive an appropriate and valuable benefit, for free.  In fact, smaller funds logically support a higher percentage fee award, due to the perception that large percentages of very large settlements lead to windfalls for attorneys.  *See In re Prudential Sales Practices Litigation,* 148 F.3d 283, 339 (noting "inverse relationship" of large settlement to a smaller percentage award).  Given, the settlement value conferred here, a fee and cost award of less than 1.0% of the total value conferred on the class, and 11.95% of the guaranteed value, is well below the norm.

There were no objections to the settlement, and no objections to Plaintiff's fee request.  This factor supports approval of the fee request.

The third factor – counsels' skill and efficiency – supports approval. The quality of representation is measured by "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000). Here, Plaintiff's counsel pursued a case articulating a theory of class recovery calculated to circumvent significant adverse authority created in other similar cases. Counsel have been able to achieve a fairly rapid and efficient resolution of the Class' claims. Counsel have substantial experience in consumer class litigation, as demonstrated by the Declaration of Counsel appended to the Preliminary Approval Motion. Counsel have been routinely approved as class counsel in consumer and employment class litigation, by Courts in the Western District and elsewhere.

The fourth factor – the complexity and duration of the litigation – also supports approval. This litigation has been pending for almost one year. Plaintiff's counsel have had to expend a substantial amount of time not only in this case, but in similar cases, to best position the legal theories being prosecuted for a successful outcome. If the claims were fully litigated, Plaintiff would have faced considerable risks with respect to class certification and Defendant's liability defenses.

The fifth factor, risk of nonpayment, is neutral.

The sixth factor is the amount of time devoted to the case by Plaintiff's counsel. Plaintiff's counsel spent 466.00 hours prosecuting the claims in this action. Therefore, Plaintiff submits that this factor supports approval.

When considering the seventh factor, "awards in similar cases," a court should look to awards in cases of similar size, and not necessarily similar subject matter. *See Cendent PRIDES*, 243 F.3d at 737.

In this case, Plaintiff requests attorneys' fees and costs in the amount of $225,000.00. The fee and cost payment of $225,000 represents 11.95% of the $1,882,300.00 guaranteed value achieved for the Class.

Applying all of these factors, Plaintiff submits that the fee request is reasonable and appropriate.

### B.     A Lodestar Analysis Confirms That The Fee Requested Is Reasonable

The lodestar and expenses for counsel here, as described in counsel's Declaration, are $186,448.50, reflecting 466.00 hours of attorney and paralegal time, and costs of $686.00.

Lodestar is derived by first multiplying the hours expended on the engagement by current hourly rates. *See, e.g. GM Trucks*, 55 F.3d 768, 819 n.37 (3d Cir. 1995); *Skelton v. General Motors Corp.*, 860 F.2d 250, 255 n.5 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989). In computing the lodestar, the hourly billing rate to be applied is the market value of such time, *i.e.*, the hourly rate that normally is charged in the community where counsel who initiated and prosecuted the action practice for cases of the type at issue. *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 590-91 (3d Cir. 1984).

In using the lodestar/multiplier approach, lodestar is typically only the starting point. The Court should adjust the lodestar upward (apply a "multiplier") to take into account such factors as (i)  the contingent nature of the fee and consequent risk of non-payment;  (ii) the risk of the case;  (iii) the quality of representation;  (iv) the result achieved;  and, (v)  the standing of counsel. *In re Fine Paper Antitrust Litig.*, 751 F.2d at 583-84.  In adjusting the lodestar, courts

have also taken into account such matters as the need to encourage experienced and able private counsel to undertake such litigation. *In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 750-751 (S.D. N.Y. 1985). A fee and cost payment of $225,000.00, in this case, is consistent with a modest multiplier of approximately 1.2.

### 1. Hourly Rates

The hourly rates for Plaintiff's counsel are well within the range of what is reasonable and appropriate in this market. *See* Declaration of Class Counsel attached to Fee Motion. The hourly rates are within the range charged by attorneys with comparable experience levels for consumer/employment class action litigation of a similar nature.

### 2. Hours Expended

In support of this Motion, Plaintiff has submitted a spread sheet delineating the time expended by Class Counsel to prosecute this litigation, broken down by attorney or paralegal, hourly billing rate, and general category of work performed. There was not time for which compensation is now requested in this case that was "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). All time billed was reasonably necessary to achieve the successful outcome achieved for Plaintiff and the Class in this case.

Plaintiff respectfully submits that a fee and cost award of $225,000.00 is wholly appropriate in this case. *See*, *Perry v. FleetBoston Financial Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005)(approving multiplier of 1.5 in connection with a settlement under the Fair Credit Reporting Act).

### C. The Requested Plaintiff's Incentive Award Is Reasonable And Appropriate

As set forth in the Class Notice, Defendant has agreed to pay an incentive payment of

$2,500.00 to Plaintiff. This payment is warranted as a matter of public policy and is well supported by applicable authority. *See, e.g., In re Chambers Development Securities Ligit.*, 912 F.Supp. 852, 863 (W.D. Pa. 1995)(approving incentive payment of $2,500 to each plaintiff); *In re GNC Shareholder Litig.*, 668 F.Supp. 450, 451 (W.D. Pa. 1987)(approving incentive payment of $3,000 to each plaintiff).

## V.   CONCLUSION

For all of these reasons, Plaintiff respectfully requests that the Court approve the fee and costs agreement negotiated by the Parties, as well as the negotiated incentive payment for Plaintiff.

Respectfully submitted,

/s/ R. Bruce Carlson
R. Bruce Carlson
PA56657
bcarlson@carlsonlynch.com
Gary F. Lynch
PA56887
glynch@carlsonlynch.com

**CARLSON LYNCH LTD**
231 Melville Lane
P.O. Box 367
Sewickley, PA  15143
(P) (412) 749-1677
(F) (412) 749-1686